Scoeield, J.,
delivered the opinion of the court:
Congress having authorized the erection of a government building at Memphis, Tenn., and made several appropriations therefor, and the foundation walls having been laid, proposals for the cut stone to complete the building, either granite, sandstone, or marble, were invited by public advertisement, dated-December 14, 1877.
Claimant made a proposal for sandstone, which was accepted by the Secretary of the Treasury May 1, 1878; he was notified of this acceptance and directed to “ proceed to work at once.” He was also informed that a contract was in preparation and would be forwarded to him for execution in a few days. The contract was forwarded, and signed by him and the Supervising Architect, but not by the Secretary of the Treasury.
Claimant went to work quarrying and cutting stone, and up to June 22, 1878, had incurred a large expense from which there was an absolute loss of $1,500. At that time the Supervising Architect informed him that an act of Congress just passed, required the use of Tennessee marble instead of sandstone, and that he must stop work, and suggested that he should come to Washington. He came to Washington, and an agreement to amend his contract was finally made by which marble was substituted for sandstone at an advance in price of $85,000.
Thereupon, he went to Tennessee and made arrangements for the marble and transportation thereof, and sent workmen and tools to Memphis at considerable expense.
July 17, 1878, while thus engaged upon his work, he was informed by the Supervising Architect that “ the Secretary withdraws authority to modify.” the contract, “ and directs read-vertisement.” This ended claimant’s connection with the business.
The claimant brings suit to recover his lost outlay and prospective profits under one or the other of these contracts. His right to recover upon either will be best understood by considering the objections to them interposed by the defendants.
The contract to furnish marble is objected to because no advertisement preceded it, as required by section 3709 Bevised Statutes.
*551 The court cannot infer from the facts in the case that a public exigency required the immediate performance of the work.
When Congress directs the erection of a public building, and appropriates only a small part of the money declared by the act to be necessary for its completion, with the evident design of extending the work over a series of years, the idea of “ immediate delivery of the articles or performance of the service ” seems to be precluded.
However that may be, the Secretary declared no such exigency, and his action indicates that, in his judgment, none existed. Certainly none is shown.
In the absence of any exigency, in fact, or any declared by the Secretary, or any that can be judicially inferred, we think the portion of the section which requires advertisement is mandatory, and a contract made in violation of it is void. (Clark v. United States, 95 U. S, 539; United States v. Speed, 8 Wall., 77); Henderson’s Case, 4 C. Cls. ,75; Wentworth’s Case, id., 302.)
But it is argued that this was only a modification of the sandstone contract which had been made after due advertisement. The cases of Solomon v. The United States (17 Wall., 17), and of Piatt’s Administrators v. The United States (22 Wall., 469), with other authorities, are cited in support of this view. But the court is of the opinion that the modification makes essentially a new and different contract. The one is an agreement to furnish sandstone from the State of Illinois, the other to furnish marble from the State of Tennessee. The price in the one case is $58,125 ; .in the other, $143,125. It is only a change of one article for another, to be sure, but that one article is all there is of the'contract. The Secretary of the Treasury at first regarded it as a modification, allowable under the statutes without advertisement, and as such approved it, but upon reflection he withdrew his approval. We think the Secretary’s final decision was right.
The contract being invalid, the claimant acquired no rights under it. He was bound, as well as the officers of the government, to know the law, and if both mistook it, each must bear his own loss. (Pierce v. United States, 7 Wall., 666; McCollum’s Case, 17 C. Cls. R., 103.)
This brings us to the consideration of the rights of the parties under the sandstone contract.
The formal contract signed by the claimant and Supervising Architect was not signed by the Secretary. The Architect had *552 no power to bind tbe government, and tbe contract, recognizing his lack of power, expressly provided that the “ contract shall be valid and binding when approved by the Secretary of the Treasury, and not otherwise.” This so-called contract may therefore be eliminated from the case.
Although this point was strongly contested upon the trial, in the judgment of the court it makes little or no difference in the rights of the parties, because by express language of the formal contract the advertisemeut and specifications are made a part of it, while it is conceded and the court holds that the advertisement and specifications with the proposal and acceptance, constitutes a contract binding upon both parties. (Garfielde’s Case, 93 U. S. R., 244; McCollum's Case, 17 C. Cls. R., 92.)
This contract was rescinded by the defendants, not because they had at that time any fault to find with the claimant, but because Congress had passed a law requiring the building to be made of Tennessee marble instead of sandstone.
The counsel for the government, however, in fidelity to his calling, has presented for our consideration two other facts which he claims might justify the rescission.
First. The advertisement required that the quarry should be u fully opened and capable of furnishing the quantity, &c.” It is alleged that the quarry was not fully opened when the bid was made, and its capacity therefore was unknown. It appears in the findings that on the side of the quarry next to the river the whole ledge of rock for several miles in extent was exposed to view. From this side the neighboring people had been accustomed for many years to quarry small lots of stone for home use. Back from the river the claimant had stripped off the earth in divers places, drilled into and blasted the rock to determine its extent and quality. Whether this opening was sufficient to answer the rexuirements of the advertisement may well be questioned. The purpose of the government was to be assured in advance that the quarry contained stone enough of the sample quality to complete the building. While the proposal was under consideration the government had a right to require satisfactory evidence, by a full opening, of that important fact. A failure to furnish it would have justified a rejection of the proposal. The defendants had from January 8 to May 1 to *553 make objections on that account, but made none. We do not say that a subsequent discovery that the stone was likely to fail in quantity or quality would not have justified the defendants in terminating the contract; but the acceptance of the proposal after long deliberation and opportunity to examine the condition of the quarry, would, to some extent, change the issue and give the defendants the affirmative of it. The issue would be no longer whether the quarry was sufficiently opened at the time the proposal was made to demonstrate its extent, but whether from appearances at the time the contract was rescinded it was likely to prove insufficient. At this latter date the quarry had been more fully opened and all the indications pointed to a superabundance of stone of the sample quality.
A second justification is supposed to be found in the fact that the claimant’s lease did not cover the point in the quarry where the sample stone were taken out. It appears that the division line had not been definitely marked on the ground and the sample stone were taken in mistake, just over the line. The quality of the stone is the same on both sides of the line. The mistake was not discovered until the claimant came to quarry the stone. When discovered, he immediately, to wit, May 9, 1S78, bought the adjoining land and thus enlarged his quarry. The government was not injured by the mistake so promptly corrected and has no reason to complain.
In all this business, the officers of the government and the claimant acted in perfect fairness and good faith towards each other. The whole trouble grew out of the act of Congress, which required the use of Tennessee marble instead of sandstone.
It is further urged that the defendants were not bound by the contract to accept more sandstone than was required to ■construct the first story, that is, from line A to line B. We concur in this view of the case. The language of the advertisement is that—
“Proposals must be made for the entire work complete # * * and the bidder must state in his proposal the amount required to complete the work from line A to line B, the amount required for the work from line B to line C, and the amount required to complete the work above line C.
“ The successful bidder will be required to enter into an agreement with this Department to supply and deliver the stone *554 work required from line A to line B, and if desired, the remainder of the work as Congress may appropriate money therefor
The proposal says “I hereby propose to furnish and deliver at the site of the United States custom house, &c., at Memphis, Tenn., all the cut stone work required for the construction of the superstructure of said building in full accordance with # # # terms of the advertisement.”
The amount of all appropriations available for the work on May 1,1878, was $34,419.86; not sufficient at that time to authorize the claimant under the conditions of the advertisement to demand a contract for the whole building. The next and further appropriation made June 20,1878, was coupled with the provision that marble should be used instead of sandstone. The contract as made up of these several parts, bound the defendants to receive and pay for the material and work required to construct the building from line A to line B, but no more, unless desired by the defendants, and unless Congress made appropriations therefor. Neither of these conditions were presented. The defendants did not desire it and Congress refused all appropriations, of which fact the claimant was notified June 22,1878. This conclusion is in accordance with the construction uniformly placed upon unilateral contracts by this court. (Caldwell’s Case, 8 C. Cls. R., 335; Brawley’s Case, 11 id., 522, affirmed on appeal, 96 U. S., 168; Merriam’s Case, 14 id., 289; Gates’s Case, 15 id., 119; Fenton’s Case, 17 id., 158.)
From this view of the case it results that the claimant is entitled to recover the profits that would have accrued to him by furnishing the sandstone according to the terms of his contract required to construct the building from line A to line B.
The rule of damages in a case of this kind is settled, in United States v. Speed (8 Wallace, 77), to be “the difference between the cost of doing the work and what claimants were to receive for it, making reasonable deduction for the less time engaged and for release from the care, trouble, risk, and responsibility attending a full execution of the contract.”
Following this rule the court has found that the claimant is entitled to recover as prospective profits the sum of $3,000.
In addition to the prospective profits the claimant is entitled to recover so much of his necessary outlay as became wholly lost to him in consequence of the rescission of the sandstone *555 contract by the defendants. (Behan’s Case, 18 C. Cls. R., 699, and the authorities there cited.) The amount is found to be $1,500.
The two sums make $4,500, for which judgment will be given to the claimant.